## ROBERT CHANEY et al. v. A. C. BRYAN.

1. CHARGE OF COURT. *Morbid delusion. Effect upon wills.* The court charged the jury: "If the testator's belief in the infidelity of his wife and animosity to his children, was a topic which, when occurring to him, so deranged his mind as to prevent him from judging the objects of his bounty, and he made the will while laboring under this morbid delusion, then the will must fall. But if, on the other hand, you find that at the time he made the will, he exercised his judgment, whether right or wrong, the will must stand, however much he may have indulged prejudice against his family." *Held,* that this is the law.

2. HOLOGRAPHIC WILL. *Evidence.* If a holographic will be written in an account book, it is not error to refuse to allow testimony tending to show that several leaves of the book are missing.

### FROM SUMNER.

Appeal in error from the Circuit Court of Sumner county. · J. C. STARK, J.

HEAD BROS. for Bryan.

J. J. TURNER and B. F. ALLEN for Chaney.

DEADERICK, C. J., delivered the opinion of the court.

Defendants Bryan and wife, Sallie, propounded for probate in the county court of Sumner county, a paper writing as the will of H. M. Chaney. Its *validity* was contested by plaintiffs in error, who are heirs-at-law of said H. M. Chaney, and an issue was made up in the circuit court to try the validity of said paper writing.

Upon the issue of *devisavit vel non* three mistrials were had. The fourth trial resulted in establishing the will, and a new trial having been refused, the contestants have appealed to this court. The Referees have recommended a reversal of the judgment below, and the defendants in error have excepted to their report.

Mrs. Bryan died during the pendency of the suit, leaving one son, still a minor, and his father, in whose name alone the suit was thereafter prosecuted.

The deceased had lived in Kentucky, where, for many years, he was a prosperous business man, of steady habits, and had accumulated a handsome property as a merchant and farmer. Some year or two before 1871, he acquired the habit of drinking to excess, and about the same time contracted an intimacy with a woman of bad reputation, living on or near his own farm. His cohabitation with this woman was open and notorious. He had a wife and children, all grown except the youngest, a daughter, about seventeen years of age. His wife was a woman of excellent character, as were his children, but his misconduct led to family discord, and finally, about 1870, he and his wife, by consent, separated, and he conveyed to her the tract of 160 acres of land on which they had lived, worth about $7,500, and left the State, taking with him the woman whom he had been keeping, to Indiana. Before he left he charged to a number of his friends and neighbors, that his wife had been unfaithful to him; that his reputed children were not his in fact, but except one, were all the offspring of

illicit intercourse of his wife and several different men, whom he named.

He took with him to Indiana some $25,000 or $30,000 in cash, and while there instituted proceedings by which he obtained a divorce from his wife, and then married the woman he had taken with him from Kentucky. In 1871, with his second wife, he removed to Sumner county, Tennessee; bought a farm there for $8,000 or $9,000, and lived with her there until 1875; became dissatisfied with her and gave her $1,000 to leave him, which she accepted, and left him. After this, he wrote to his niece, Mrs. Sallie Bryan, to come and live with him and take care of him until he died, and he would give her the farm upon which he lived. Mrs. Bryan, with her husband and son, lived in Indiana, and did come to deceased's house four months before he died, and they took charge of the domestic affairs of deceased, and attended to him until his death, in January, 1876. He was about sixty-three years of age at the time of his death.

The paper propounded for probate is upon a leaf of an account book kept by deceased, and is written with a pencil, and is in the following words:

"DECEMBER 10, 1875.

H. M. Chaney to Sallie Bryan. I give to Sallie Bryan his (or this) farm at my death. If she leaves before that time this will be null and void.     H. M. CHANEY."

A very large number of witnesses were examined, chiefly as to the sanity of testator, and as to the hand-writing of the will. There is conflict in the evidence upon these points, and the Referees very properly say, "if there is no reversible error found

5—VOL. 16.

in the charge of the court, or in his rulings upon questions of evidence, the judgment must stand," as there is sufficient evidence to sustain the verdict.

His Honor, in his charge to the jury, says: "If the paper writing in controversy is a will, it is in law denominated a holographic will, and if established as such, must be done in strict conformity with the law governing wills of this kind, which is this." Then follow the provisions of the statute, Code (old), section 2163, (new), section 3004, defining the character of such will, and how it is to be executed, kept and proved, with accurate instructions as to the kind and amount of testimony necessary to establish the requisites of the statute.

It appears from the record that testator was competent, up to the time of his death, to transact business intelligently, but it is insisted that in respect to the chastity of his wife and the legitimacy of his children, he labored under an insane delusion, and was, upon this subject, a monomaniac. The charge upon this subject was in accordance with the received authorities.

Amongst other things in relation to insane delusions, and a general definition of the term, the court charged the jury: "If a will, as I have stated to you, is the direct offspring of this insanity, it is void, but if the testator exercised his judgment in making his will, however his mind may have been disturbed by passion and prejudice, which was wrong, the will must stand. If the testator's belief in the infidelity of his wife and animosity to his children was a topic

which, when occurring to him, so deranged his mind as to prevent him from judging the object of his bounty, and he made the will laboring under that morbid delusion, then the will must fall; but if, on the other hand, you find that at the time he made the will *he exercised his judgment, whether right or wrong, the will must stand, however he may have indulged prejudice against his family.*" Of this latter, or alternative part of the charge, the Referees report: "We are not satisfied that this portion of the charge which we have italicised, was sufficiently definite; that the jury may not have been misled."

After further observations upon the subject, the Referees say: "The precise point to which the jury should have been directed, was to ascertain if the testator did entertain an insane delusion toward his wife and children, and if so, was he in any way influenced by this delusion when he gave the land to another? Did this delusion affect his judgment?"

The only delusion suggested by the record, or argument of counsel, was that in respect to his wife's infidelity and the consequent illegitimacy of his children.

His Honor had distinctly told the jury, "if the testator was, at the time of making the will, partially insane, in other words, if the act of making the will was the result of the morbid delusion of the testator, the act is void, although the testator, at the time of making the will, was sane in other respects, upon ordinary subjects. "Monomania," adds the court, "is a morbid affection of the mind, consisting in a mental or moral perversion, or both, in

regard to some particular subject, or class of subjects."
Again he says: "Monomania is an insane delusion,
believing in the existence of things which do not
exist, and which no sane man would believe. If a
will, as I stated to you, is the direct offspring of
this insanity, it is void."

Again, applying the law previously announced to
the facts of this case, according to the theory of the
defense, his Honor said: "If the testator's belief in
the infidelity of his wife and animosity to his chil-
dren, was a topic which, when occurring to him, so
deranged his mind as to prevent him from judging
the objects of his bounty, and he made the will
while laboring under this morbid delusion, then the
will must fall. But if, on the other hand, you find
that at the time he made his will he exercised his
judgment, whether right or wrong, the will must
stand, however much he may have indulged prejudice
against his family."

We think the charge as quoted did direct the minds
of the jury to the point in issue, and could not have
misled them. They are repeatedly told what consti-
tutes insane delusion, and they are also told if the
will was made under such delusion, it was void, and
in effect they are told if the testator's belief in his
wife's infidelity, and his animosity to his children so
deranged his mind as to prevent him from judging
the objects of his bounty, and the will was made
under this morbid delusion, it would be void. But
if he did not act under the influence of insane delu-
sion, but from prejudice, in the exercise of his judg-

ment, the will would be valid. And we think these instructions were correct.

Several objections were taken by defendants below to the rulings of the court upon the admissibility of evidence.

On the trial below defendants offered to prove that for the care of and living with testator, Mrs. Bryan claimed the personalty, and had sued and recovered for it, and it was proved that for such service by her the testator promised to give her the land. This evidence was rejected on objection by plaintiffs, and the Referees report that this was error. We do not think so. The evidence offered was not relevant to the issue then being tried, as the execution of the will and competency of testator, but a collateral one, and upon a different proceeding from the cause then on trial. The same objection of irrelevancy lies to the offer by defendants to prove that Mrs. Bryan's brother claimed a certificate of deposit given by an Evansville bank to testator for $21,500.

The Referees report this was error, but we think otherwise. It had no relation to the issue in this case, nor were plaintiffs in any wise concerned in the suit pending between testator's administrator and Martin Baskett, the claimant.

Defendants also proposed to prove that there were two missing leaves in the account book in which the will was written. This, on objection by plaintiffs, was refused. This, the Referees say, is error. But the leaves had no connection with the will, and the evidence was irrelevant and properly rejected.

A witness was asked if the account book was in the same condition when he received it as when he returned it to plaintiffs, and if several leaves were not taken out of it. This was, on objection, rejected, which, the Referees say, was error.

The question is not as to the will, but the account book, and whether two leaves were not cut out, etc. The testimony rejected could throw no light on the issue as to the will, and was properly rejected. The court also refused to allow comparison of the hand-writing in the book with that of the will. In this we think there was no error. This is not the mode, well established by repeated adjudications, of proving hand-writing. The will had been written on a blank leaf of the book which contained testator's accounts, and was, after his death, cut out of the book, and the book was only introduced to show that the will was kept by testator with his valuable papers.

We are of opinion that the judgment of the circuit court was correct, and the exceptions to the report of the Referees are sustained, and it will be set aside, and the judgment affirmed.